Filed 3/24/21  P. v. Dickson CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JARVIS LEE DICKSON, JR.,<br><br>Defendant and Appellant. | F077746<br><br>(Fresno Super. Ct. No. F17902343)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Jonathan Skiles, Judge.

Gordon S. Brownell, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Keith P. Sager, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

A jury convicted appellant Jarvis Lee Dickson, Jr. of a single count of first degree residential burglary (Pen. Code, §§ 459 & 460, subd. (a)).[1] He was sentenced to prison for the midterm of four years, which was doubled because of a prior strike conviction. His sentence was further enhanced by five years for a prior serious felony conviction (§ 667, subd. (a)(1)).

Appellant asserts that the trial court abused its discretion in denying a motion for mistrial. He also contends that both instructional and cumulative errors occurred. We reject these claims. However, we agree with the parties that remand is required for the court to exercise its sentencing discretion under Senate Bill No. 1393 (2017–2018 Reg. Sess.) (Senate Bill 1393) regarding the five-year enhancement imposed under section 667, subdivision (a)(1). We remand for that purpose but otherwise affirm.

## BACKGROUND

The prosecution established that on April 17, 2017, appellant burglarized a home in Fresno County. This crime occurred during the midmorning hours, and a victim, Cecilia S., was home at the time.[2] At trial, Cecilia identified appellant as the burglar. We summarize the material trial evidence.

### I.     The Burglary

The burglary started when someone repeatedly rang the doorbell and knocked on the front door. Cecilia became alarmed. She went to a window and saw a male on the front porch. She testified that she had a clear and unobstructed look at his face while he stood near the front door. The male rang and knocked for about 90 seconds. She looked at him for about six seconds.

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

[2] The residence belonged to Cecilia's parents.

Cecilia retreated away from the front door and to the back of the house. Through a different window, she saw a blue Hyundai parked on the street outside the residence. She told the jury that she knew their neighbors very well, and she would "definitely" notice if an unfamiliar car or a person were present in the neighborhood. She testified that the Hyundai did not belong to her neighbors.

From the back of the house, Cecilia heard someone manipulating the screen to a window near the front door. She returned to the hallway and yelled she was calling the police. A short time later, she called 911. Around that time, she realized the blue Hyundai was gone.

Law enforcement arrived shortly thereafter. It was discovered that a screen had been removed from a front window. Although that window could slide open, it was locked and still closed.[3]

## II.      The Incident Later on the Day of the Burglary

Sometime around 6:00 or 7:00 p.m. on the day of this burglary, Cecilia's fiancé at that time, Omar S., and one of her brothers, Carlos C., had an encounter with appellant. This incident started when a blue Hyundai drove past the residence of Cecilia's parents. Carlos saw the vehicle drive by. He believed it might be the same vehicle which Cecilia had described as being involved in the burglary. Carlos alerted Omar, who decided to try to find the Hyundai.

Omar drove and he managed to locate the Hyundai. He took pictures of it with his cellphone. During that process, the driver of the Hyundai saw what was happening, and that driver began to chase Omar. Both vehicles returned near the residence of Cecilia's

---

[3] Law enforcement dusted the area around the window for fingerprints, and also on the front door handle. Appellant does not challenge the sufficiency of the evidence supporting his conviction for first degree residential burglary (§§ 459 & 460, subd. (a)). Our Supreme Court holds that "a window screen is clearly part of the outer boundary of a building for purposes of burglary." (*People v. Valencia* (2002) 28 Cal.4th 1, 12, disapproved on other grounds by *People v. Yarbrough* (2012) 54 Cal.4th 889, 894.)

parents. Angry words were exchanged, and Carlos recorded this incident on his cellphone. At trial, both Omar and Carlos identified appellant as being the driver who had the angry exchange with them.

During this incident with Omar and Carlos, appellant denied burglarizing the residence. He said he did not "need anything" from their house because "I sell p[***]y and weed." He threatened to use a firearm during this encounter, but he never produced a weapon. He also threatened to return with people to "shoot up" the family and house. He referred to himself as "J-Mac" and stated he was from "Diamond Crip." The encounter deescalated and appellant drove away without further incident.

Cecilia was not home when the angry exchange occurred between appellant, Omar and Carlos outside her parents' residence. She returned home around 9:00 p.m. that night, and she was told about this incident. Carlos showed her the recording on his cellphone. At trial, she testified that the blue Hyundai recorded in the video was the same vehicle she saw earlier when this burglary occurred. Cecilia admitted that she could not see the driver's face clearly in the video. She believed the person recorded by Carlos had the same general facial features as the burglar.

### III. Appellant s Identified in Photographic Lineups

The day after this burglary, a detective showed six-pack photographic lineups to Cecilia, Omar, and Carlos. They viewed the photos separately. Cecilia identified appellant's picture as the person whom she saw on her front porch. She immediately recognized him. In court, she identified appellant as the person depicted in that photo. She told the jury that she selected appellant's photo based on her memory of him standing on the front porch, and not based on the recording that Carlos had made after the burglary during the incident involving the blue Hyundai.

Omar and Carlos also separately identified appellant's picture in their photographic lineups. They selected appellant's photo as representing the suspect who

had driven past the residence that same evening in the blue Hyundai, and who had returned for the angry exchange.

## IV. The Defense Expert

Mitchell Eisen, a forensic psychologist, testified for the defense as an expert on eyewitness identifications. In general, Eisen explained the science behind human memories, and how they are created, stored, and altered. Eisen informed the jury that cross-racial identifications are harder than identifications within the same race. He stated that it was "a more error prone process to pick folks" from another racial group. Eisen described how exposure duration, the passage of time, and the distance between a witness and the suspect can all impact the accuracy of an identification. He explained the carry-over effect, which occurs with repeated identification procedures where someone is exposed to images of the same individual more than once. The prior exposures can carry-over and influence subsequent identifications, which can cause errors.

## DISCUSSION

## I. The Trial Court Did Not Abuse Its Discretion in Denying a Mistrial and Any Presumed Error Was Harmless

Appellant argues the trial court abused its discretion in denying his motion for a mistrial. He contends his judgment must be reversed, but he acknowledges the prosecution should be permitted to retry him.

### A. *Background*

The motion for mistrial was triggered after a detective, Haywood Irving, provided certain testimony. Irving was the detective who had investigated this burglary and who showed the photographic lineups to the witnesses. At trial, the following relevant testimony occurred:

> "[THE PROSECUTOR]: Okay. Now at the time that you were assigned this particular case, did you have any information with regard to a particular suspect, any name or anything like that?

5.

"[IRVING]: During my duties, during that period of time, I had developed information regarding a potential suspect, yes."

Defense counsel objected and she requested a sidebar. After meeting with both counsel, the court excused the jury and defense counsel made a motion for a mistrial. According to the defense, this question and answer had violated a motion in limine.

### 1. The Motion in Limine

The defense had filed an in limine motion to exclude any comment or reference regarding appellant "being a suspect in recent burglaries in the same area of the burglary in this case." The court granted that request.

The prosecutor advised the court that Irving was "very familiar" with appellant. The prosecutor wanted the opportunity at trial to bring out that Irving knew appellant. The court stated it was permissible for Irving to testify that he had prior contacts with appellant, but Irving could not discuss prior investigations or prior alleged criminal behavior.

### 2. The Arguments Below Regarding the Motion for a Mistrial

In arguing for a mistrial, defense counsel asserted that Irving had received information that appellant "was a suspect in multiple residential burglaries" in the same neighborhood as this burglary. It was the defense's position that, based on Irving's testimony, the jury would know that appellant had been a burglary suspect even before Irving started investigating this matter. The defense claimed the "bell has been rung."

The court agreed that Irving's answer conveyed "a very clear picture" that Irving had focused on a particular suspect, and it was likely the jury would believe that suspect was appellant. The court heard extensive arguments from counsel regarding how to proceed. The court released the jury for the day.

Arguments resumed the next morning. Defense counsel reiterated that Irving's testimony implied that he had already suspected appellant for this burglary even before he had started his investigation. Defense counsel argued that the in limine motion had

been violated, and an admonition would not cure the harm. In contrast, the prosecutor contended that no "bell" had been "rung" and any harm to appellant was "completely speculative." The prosecutor asserted an admonishment was possible, and a mistrial should not be granted.

The court stated that the defense had a "legitimate reason" to raise a motion for mistrial because "the question [to Irving] was somewhat open-ended and the answer could allow a jury to speculate about what that information was." Although the jury did not have all of the information about Irving's prior history with appellant, and although Irving's testimony did not specifically identify appellant as the initial suspect, the jury could speculate about what his answer meant. The court noted that the jurors had been instructed, and would be instructed again, that they could only use evidence received in trial in reaching their verdict. The court believed that any concern for speculation could be addressed at the start of Irving's renewed testimony with a question asking if he had developed information regarding a potential suspect through another officer. According to the court, that would clarify for the jury what Irving had been referencing when he said he had developed information. The court declined to give an admonition to the jury, believing it would "actually invite speculation about something that I'm actively trying to get them to not speculate about." The court denied the motion for mistrial.

Defense counsel agreed that an admonition was not proper because it would "further highlight" the disputed question and answer, and cause even more speculation. The court stated it believed the motion for a mistrial had been properly raised, but it did not feel that the prosecutor had tried to circumvent the court's in limine ruling. The prosecutor's question to Irving, however, "could have been more artfully phrased" and it had "opened a door for [Irving] to answer in a way that can cause the jury to speculate." The court ruled it would not give an admonishment.

Before Irving resumed his testimony, the court informed him that he was not to reference appellant being a suspect in any other burglaries. Irving could also not

7.

reference appellant's parole status. The court apologized to the jury for the delay in the proceedings. The court told the jurors that "something else came up that was not related to this case that I had to address," so the jury had been excused for the day.

Irving's testimony resumed. After exchanging pleasantries, the first substantive remarks were as follows:

> "[THE PROSECUTOR]: Now yesterday when we ended our discussion, I believe I had just asked you a question and you stated that when you received the case, you had started developing information about a potential suspect. Was that based upon the reports that you received from [other named officers] in this case?
>
> "[IRVING]: Yes."

## B. *Standard of Review*

A trial court should grant a mistrial only when the chances of either party receiving a fair trial have been irreparably damaged. (*People v. Bolden* (2002) 29 Cal.4th 515, 555.) A deferential abuse of discretion standard is used to review a trial court's ruling denying a mistrial. (*Ibid.*) Under this standard, we will not disturb the ruling unless " 'the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' [Citation.]" (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124–1125, quoting *People v. Jordan* (1986) 42 Cal.3d 308, 316.)

## C. *Analysis*

Appellant concedes that the trial court did not act capriciously or in a patently absurd manner when denying a mistrial. He notes that the court heard lengthy arguments over two days and it carefully considered whether an admonition could cure the harm. Nevertheless, appellant maintains that the court's remedy was "arbitrary" because Irving continued to testify, and Irving only provided a "half-truth" to the jury. Appellant contends the court permitted an inference to exist that appellant was a suspected burglar even before Irving was assigned this case. He maintains that the court accentuated the

8.

prejudice rather than eliminate it.[4]  According to appellant, the court placed its own convenience ahead of appellant's right to a fair trial.

We find appellant's various assertions unpersuasive.  The trial court did not abuse its discretion and any presumed error was harmless beyond a reasonable doubt.

### 1.    The Trial Court Did Not Abuse Its Discretion

Our Supreme Court notes it is always a "speculative matter" to determine whether a particular incident is so prejudicial that a motion for mistrial should be granted. (*People v. Avila* (2006) 38 Cal.4th 491, 573.)  It is for this reason that a trial court is vested with considerable discretion in ruling on mistrial motions.  (*Ibid*.)

We agree with respondent that any possible harm to appellant was speculative. The jury was never told that appellant had committed other burglaries in the area or that appellant had been a prior burglary suspect.  Even if Irving's initial answer invited the jury to speculate that Irving had focused on appellant at the very start of his investigation, Irving's follow-up answer reasonably quelled that concern.  Irving agreed that his focus on a suspect stemmed from the police report he had received regarding this burglary.

We reject appellant's position that the jury could have extracted meaning from Irving's disputed testimony that irreparably prejudiced the defense.  The jury was instructed to decide the facts in this matter "based only on the evidence that has been presented to you in this trial."  We presume the jury followed this instruction.  (*People v. Boyette* (2002) 29 Cal.4th 381, 436.)  At no time did the jury request readback of Irving's testimony.  Instead, the jury asked for a readback of Cecilia's testimony.  Based on the evidence the jury heard, a reasonable inference did not exist that appellant had been suspected of committing other burglaries, and we reject appellant's contrary contention.

---

[4] In a footnote, appellant states he is not accusing either the prosecutor or Irving of deliberately violating the in limine ruling.

We further disagree that the trial court placed its own convenience ahead of appellant's right to a fair trial. The court carefully considered whether to grant a mistrial. The court heard extensive arguments from counsel. The court's reasoning was thoughtful and balanced. The court articulated why it believed an admonition would do more harm than good.

In the end, the court apologized to the jury for the delay, and it prevented the jury from believing the delay had anything to do with appellant or his defense. The court directed the prosecutor to ask a follow-up question to Irving which provided a reasonable explanation why Irving, at the start of his investigation, "had developed information regarding a potential suspect[.]" We agree with the court's implied conclusion that this incident was not so prejudicial that a mistrial should have been granted. We cannot state that the court's ruling was arbitrary, capricious or patently absurd, or that a manifest miscarriage of justice occurred. As such, an abuse of discretion is not present. Accordingly, this claim fails, and reversal of the judgment is not warranted. In any event, any presumed error was harmless.

### 2. Any Presumed Error Was Harmless

Where there is compelling evidence of guilt, the erroneous denial of a motion for mistrial may be harmless error. (*People v. Harris* (1994) 22 Cal.App.4th 1575, 1581; *People v. Dunn* (2012) 205 Cal.App.4th 1086, 1100.)

Here, the parties dispute whether or not the standard under *People* v. *Watson* (1956) 46 Cal.2d 818 (*Watson*) should be used to evaluate prejudice. We need not resolve that disagreement. Instead, even under the most stringent standard of *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*) we can declare that any presumed error was harmless.

The evidence of appellant's guilt was compelling and strong. Prior to trial, Cecilia identified appellant's picture in the photographic lineup that Irving conducted. She

immediately recognized him. At trial, Cecilia identified appellant as the burglar. She told the jury that she had a clear look at his face. She also testified that appellant's blue Hyundai recorded in Carlos's cellphone video was the same vehicle she saw when the burglary occurred.

During deliberations, the jury asked for a readback of Cecilia's testimony. Based on the verdict rendered, it is clear the jury found Cecilia's testimony credible. Thus, we can declare that any presumed error was harmless beyond a reasonable doubt. (See *Chapman, supra,* 386 U.S. at p. 24.) In other words, the guilty verdict actually rendered in this trial was surely unattributable to the trial court's alleged error. (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279.) Consequently, even if error occurred, prejudice did not result, and this claim fails.

## II. The Trial Court Did Not Err in Refusing to Provide a Pinpoint Instruction Regarding Cross-Racial Identification and Any Presumed Error Was Harmless

During closing argument, appellant's trial counsel noted that Cecilia is Hispanic and appellant is African-American. With CALCRIM No. 315, the trial court instructed the jury regarding how to evaluate the credibility of an eyewitness identification. The court told the jury to consider numerous factors, including: "Are the witness and the defendant of different races?"

Appellant argues the court prejudicially erred when it refused to give a pinpoint instruction regarding cross-racial identification. He contends reversal is required. He asserts there is a reasonable chance he would have had a more favorable result if the court had given his requested instruction.

### A. *The Requested Pinpoint Instruction*

The defense wanted the following pinpoint instruction provided to the jury:

"In this case, [appellant] is of a different race than [Cecilia], the witness who has identified him. You may consider, if you think it is appropriate to do so, whether the fact that [appellant] is of a different race

11.

than the witness has affected the accuracy of the witness' original perception or the accuracy of a later identification. You should consider that in ordinary human experience, some people may have greater difficulty in accurately identifying members of a different race than they do in identifying members of their own race. [¶] You may also consider whether there are other factors present in this case which overcome any such difficulty of identification."

Appellant's trial counsel argued that research demonstrated cross-racial identifications are not as reliable as same-race identifications. Defense counsel sought this pinpoint instruction as a supplement to CALCRIM No. 315. According to the defense, cross-racial identification was a "critical issue" in this case, and nothing corroborated Cecilia's identification.

The trial court denied appellant's request to provide his pinpoint instruction to the jury. The court believed CALCRIM No. 315 adequately addressed the issue of cross-racial identification. According to the court, the standard instruction would link back to Eisen's expert testimony. The court also believed CALCRIM No. 315 provided "a stronger statement" on cross-racial identification than the requested pinpoint instruction because CALCRIM No. 315 states the jury "shall" consider the races involved while the pinpoint instruction stated the jurors "may consider" that issue.

**B.**    *Standard of Review*

In a criminal case, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Diaz* (2015) 60 Cal.4th 1176, 1189.) We apply an independent or de novo standard of review for a claim pertaining to a jury instruction. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

**C.**    *Analysis*

Appellant maintains that the key component of his defense was Cecilia's cross-racial identification of him as the burglar. He contends that CALCRIM No. 315 only told the jury to consider whether he and Cecilia were of different races, but it did not provide

any guidance why that question was relevant. He emphasizes that his pinpoint instruction would have conveyed to the jury important information about the problems with cross-racial identifications which CALCRIM No. 315 "utterly fails to convey."

Appellant notes that his defense counsel merely wanted the pinpoint instruction to supplement CALCRIM No. 315, and not replace it. He maintains the court could have modified his pinpoint instruction rather than reject it entirely. He also highlights opinions from around the country that have approved the use of jury instructions which do not merely list cross-racial identification as a factor to consider, but which explain why it should be considered.

Finally, appellant acknowledges the California Supreme Court has stated a jury should be instructed in a neutral manner regarding the factors affecting eyewitness identifications. According to appellant, however, that pronouncement is dicta, and we should disregard it. He urges us to hold that the trial court erred when it refused to give the pinpoint instruction. In the alternative, appellant encourages us to ask our high court to grant review in this matter so our Supreme Court can revisit how to instruct a jury regarding cross-racial identifications.

We reject appellant's arguments. We hold that the trial court did not err, and any presumed error was harmless.

### 1.     The Trial Court Did Not Err

Generally, a criminal defendant is entitled, on request, to an instruction pinpointing the defense theory of the case. (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 851.) But a pinpoint instruction may be denied if it is argumentative, misstates the law, or duplicates other instructions. (*Ibid.*)

Over a number of decades our high court has examined eyewitness identifications. In *People v. McDonald* (1984) 37 Cal.3d 351 (*McDonald*),[5] overruled on another ground in *People v. Mendoza* (2000) 23 Cal.4th 896, 914, our high court held that, when a proper showing is made, a qualified expert witness should be permitted to testify regarding factors that could impact the accuracy of an eyewitness identification. (*McDonald,* at p. 355.) *McDonald* noted that "factors bearing on eyewitness identification may be known only to some jurors, or may be imperfectly understood by many, or may be contrary to the intuitive beliefs of most." (*Id.* at pp. 367–368.) Those factors include "the effects on perception of an eyewitness' personal or cultural expectations or beliefs [citation], the effects on memory of the witness' exposure to subsequent information or suggestions [citation], and the effects on recall of bias or cues in identification procedures or methods of questioning [citations]." (*Id.* at p. 368.)

The *McDonald* court also noted "the pitfalls of cross-racial identification[.]" (*McDonald, supra,* 37 Cal.3d at p. 368.) Although many jurors would likely have "some awareness" that cross-racial identifications are less reliable, "it appears that few jurors realize the pervasive and even paradoxical nature" of this phenomenon. (*Ibid.*) In response to concerns that expert testimony about eyewitness identifications might tend to confuse a jury, *McDonald* stated that relevant evidence for the defense "cannot be excluded in wholesale fashion merely because the trial would be simpler without it. Rather, it should be accompanied by instructions clearly explaining to the jury the purpose for which it is introduced." (*Id.* at p. 372.)

About four years after *McDonald*, our Supreme Court again discussed factors that impact eyewitness identifications. In *People v. Wright* (1988) 45 Cal.3d 1126 (*Wright*), the defendant was accused of participating in the armed robbery of numerous employees

---

[5] *McDonald* was a unanimous opinion authored by Justice Mosk. Chief Justice Bird, and Justices Kaus, Broussard, Reynoso and Grodin concurred.

14.

at a company's warehouse and office building. Several masked men acted as the perpetrators. The only evidence against the defendant was eyewitness identifications. *Wright* held that the trial court had correctly declined to give certain requested jury instructions, but the lower court had "erred in failing to give an instruction listing the factors the jury could consider in evaluating eyewitness identifications[.]" However, the high court concluded that the error harmless. (*Id.* at pp. 1131–1132.)

The Supreme Court in *Wright* reached the issue it had avoided in *McDonald* – that is, "the correct wording" for an instruction regarding eyewitness identifications. *Wright* states, "We hold that a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence."[6] (*Wright, supra,* 45 Cal.3d at p. 1141.) *Wright* reasoned that if the impact of a factor was explained to the jury, it would incorporate the results of the studies from which the factors originated. It would also adopt the views of the experts who rely on them. This would confuse the roles of expert witnesses and judges. (*Ibid.*) The *Wright* court stated it was sufficient to list various factors for a jury to consider when evaluating eyewitness identifications. Listing those factors will sufficiently bring them to the jury's attention, but "an explanation of the *effects* of those factors is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate. The instruction should list the applicable factors in a neutral and nonargumentative instruction, thus effectively informing the jury without improperly invading the domain of either jury or expert witness. It should list only factors applicable to the evidence at trial, and should refrain from being unduly long or argumentative." (*Id.* at p. 1143, fn. omitted.) The *Wright* court held that "CALJIC No.

---

[6] Chief Justice Lucas wrote the majority opinion, and Justices Panelli, Arguelles, Eagleson and Kaufman concurred. Justice Mosk wrote a dissenting opinion, to which Justice Broussard concurred.

2.92 or a comparable instruction should be given when requested in a case in which identification is a crucial issue and there is no substantial corroborative evidence. [Citation.]" (*Id.* at p. 1144.)

In this matter, we decline appellant's invitation to ignore the Supreme Court's language in *Wright*. Instead, *Wright* establishes clear guidelines for us to follow. (See *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 [an appellate court is bound to follow the Supreme Court's decisions].) Moreover, our high court continues to affirm the *Wright* opinion. (See *People v. Sanchez* (2016) 63 Cal.4th 411, 462 [" 'a proper instruction on eyewitness identification factors should focus the jury's attention on facts relevant to its determination of the existence of reasonable doubt regarding identification, by listing, in a neutral manner, the relevant factors supported by the evidence.' "].)

The jury in this matter was instructed with CALCRIM No. 315, which is based on CALJIC No. 2.92.[7] The instruction provided to the jurors permitted them to consider

_____

[7] The current version of CALJIC No. 2.92 states:

"Eyewitness testimony has been received in this trial for the purpose of identifying the defendant as the perpetrator of the crime[s] charged. In determining the weight to be given eyewitness identification testimony, you should consider the believability of the eyewitness as well as other factors which bear upon the accuracy of the witness' identification of the defendant, including, but not limited to, any of the following:

[The opportunity of the witness to observe the alleged criminal act and the perpetrator of the act;]

[The stress, if any, to which the witness was subjected at the time of the observation;]

[The witness' ability, following the observation, to provide a description of the perpetrator of the act;]

[The extent to which the defendant either fits or does not fit the description of the perpetrator previously given by the witness;]

[The cross-racial [or ethnic] nature of the identification;]

[The witness' capacity to make an identification;]

16.

what weight, if any, to give to the eyewitness identifications made against appellant. (See *Wright, supra,* 45 Cal.3d at pp. 1153–1154.) The jury was told it could consider race when making this evaluation. That factor, however, was presented in a neutral manner, which complies with the requirements of our Supreme Court. (See *People v. Sanchez, supra,* 63 Cal.4th at p. 462.)

In contrast, appellant's requested pinpoint instruction stated, in part, that the jurors "should consider that in ordinary human experience, some people may have greater difficulty in accurately identifying members of a different race than they do in identifying members of their own race." This language was more than neutral, and it suggested what impact race could play in an eyewitness identification. Our Supreme Court makes it clear that any explanation of the effect of a factor impacting eyewitness identification "is best left to argument by counsel, cross-examination of the eyewitnesses, and expert testimony where appropriate." (*Wright, supra,* 45 Cal.3d at p. 1143, fn. omitted.) Consequently, the trial court did not err in refusing to give defendant's pinpoint instruction. In any event, we also hold that any presumed instructional error was harmless.

---

[Evidence relating to the witness ability to identify other alleged perpetrators of the criminal act;]

[Whether the witness was able to identify the alleged perpetrator in a photographic or physical lineup;]

[The period of time between the alleged criminal act and the witness' identification;]

[Whether the witness had prior contacts with the alleged perpetrator;]

[The extent to which the witness is either certain or uncertain of the identification;]

[Whether the witness' identification is in fact the product of [his] [her] own recollection;]

[;] and

Any other evidence relating to the witness' ability to make an identification."

17.

## 2. Any Presumed Instructional Error Was Harmless

The failure to give a pinpoint instruction requires reversal only if the reviewing court believes it is reasonably probable a result more favorable to the defendant would have been reached in the absence of the error. (*Wright, supra,* 45 Cal.3d at p. 1144; see also *Watson*, *supra*, 46 Cal.2d at p. 836.)

The jury in this matter heard expert testimony from Eisen regarding the problems with human memory and eyewitness identifications. Eisen explained it is generally harder for a person to identify another person of a different race than it is for them to identity a person of the same race.

During closing argument, appellant's trial counsel called into question the credibility of Cecilia's identification. Defense counsel emphasized that this incident took place very quickly, and it must have been stressful for Cecilia. Cecilia had inconsistencies between her initial descriptions of the suspect and her ultimate trial testimony. Counsel emphasized Eisen's expert testimony, including the problems of cross-racial identifications. Counsel noted that, based on Eisen's testimony, "the ability to recognize and identify somebody of another race is really difficult." Counsel highlighted that appellant and Cecilia are from different races.

According to defense counsel, Cecilia briefly saw a suspect at the front door, and she saw a blue Hyundai. Later that night, Carlos informed her that they "got the subject" and they showed her video of appellant. Defense counsel argued that Cecilia's identification of appellant in the photographic lineup had been influenced by the recording taken by Carlos. Counsel asserted to the jury that Cecilia's identification of appellant was tainted and false.[8] Counsel asked the jury to return a verdict of not guilty.

---

[8] Appellant's trial counsel also argued that "witness conformity" occurred because Omar and Carlos had selected appellant in the photo lineups. According to defense counsel, those identifications were tainted by the cellphone recording.

She stated, "You cannot find that the identification of [appellant] is accurate, is reliable, is an abiding conviction. Thank you."

Appellant contends his counsel's arguments to the jurors would have been more powerful if the court had instructed them with his requested pinpoint instruction. We disagree. The jurors were instructed to judge the credibility and believability of the witnesses. The jurors were informed that a factor to consider when evaluating the credibility of the eyewitness identifications is whether the witness and defendant are of different races. The jurors were told they could reject the eyewitness testimony in this matter for numerous reasons, including any cross-racial concerns.

The court instructed the jurors in a manner that permitted them to conclude Cecilia's identification was false. Defense counsel belabored that point during closing argument. Thus, prejudice did not occur despite the failure to give the requested pinpoint instruction. (See *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1144–1145 [no prejudice from failure to give pinpoint instruction regarding manslaughter because standard instructions did not preclude the jury from finding for the defense and defense counsel argued the point].) In any event, it is not reasonably probable appellant would have received a more favorable outcome had the trial court provided his requested pinpoint instruction, and we reject appellant's arguments to the contrary. As such, the alleged instructional error was harmless, and this claim is without merit.

## III. Cumulative Error Did Not Occur

Appellant raises a claim of cumulative error. !(AOB 85)! "Under the 'cumulative error' doctrine, errors that are individually harmless may nevertheless have a cumulative effect that is prejudicial. [Citations.]" (*In re Avena* (1996) 12 Cal.4th 694, 772, fn. 32.) A claim of cumulative error is essentially a due process claim. (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) The test is whether the defendant received a fair trial. (*Ibid.*)

19.

This cumulative error challenge is without merit because we have rejected appellant's individual claims. (See *People v. Bradford* (1997) 14 Cal.4th 1005, 1057 [the defendant's cumulative prejudice argument rejected based on findings each individual contention lacked merit or did not result in prejudice].) Taking all of appellant's claims into account, we are satisfied he received a fair adjudication.

## IV. Remand is Required for the Trial Court to Exercise Its New Sentencing Discretion Under Senate Bill 1393

On September 30, 2018, the Governor approved Senate Bill 1393, which amended sections 667, subdivision (a) and 1385, subdivision (b). (Stats. 2018, ch. 1013, § 2.) The legislation went into effect on January 1, 2019. As a result, trial courts now have discretion under section 1385 to strike or dismiss a five-year sentencing enhancement prescribed by section 667 for prior serious felony convictions. Courts of Appeal have uniformly held that Senate Bill 1393 applies retroactively to judgments not yet final on appeal. (*People v. Ellis* (2019) 43 Cal.App.5th 925, 927.)

Appellant was sentenced prior to Senate Bill 1393 going into effect. The court did not impose the maximum possible sentence against him. The court exercised its discretion and struck two prior strike conviction allegations. Appellant was sentenced to prison for the midterm of four years, which was doubled because of a third prior strike conviction. His sentence was further enhanced by a then mandatory five years for a prior serious felony conviction (§ 667, subd. (a)(1)).

The parties agree, as do we, that this matter must be remanded for the trial court to exercise its new sentencing discretion. On remand, the court shall consider whether to exercise its discretion to strike appellant's prior serious felony conviction enhancement. We take no position regarding how the court should exercise its discretion.

## DISPOSITION

The matter is remanded to the trial court so it may exercise its discretion under sections 667, subdivision (a)(1), and 1385, subdivision (b), as amended by Senate

20.

Bill 1393 and, if appropriate following exercise of that discretion, to resentence appellant accordingly.  In all other respects, the judgment is affirmed.


POOCHIGIAN, J.

WE CONCUR:


HILL, P.J.


DETJEN, J.